James J. Jaubert Jr. aka James Harmon v. The State of Texas










WITHDRAWN
10/31/2000




IN THE
TENTH COURT OF APPEALS
 

No. 10-99-090-CR
No. 10-99-091-CR
No. 10-99-092-CR
No. 10-99-093-CR
No. 10-99-094-CR

     JAMES HARMON JAUBERT, JR.,
     AKA JAMES HARMON,
                                                                         Appellant
     v.

     THE STATE OF TEXAS,
                                                                         Appellee
 

From the 372nd District Court
Tarrant County, Texas
Trial Court No. 0548270D
Trial Court No. 0594393A
Trial Court No. 0594394A
Trial Court No. 0594396A
Trial Court No. 0594398A
                                                                                                                
                                                                                                            
DISSENTING OPINION ON REHEARING
                                                                                                                
   
       For three reasons I cannot join my learned colleagues in their majority opinion. First, they
misapply the rules to the facts, thus reaching an improper result. Second, they do this by
essentially ignoring higher court precedent by which we are bound. Third, ultimately they
rewrite the statute as authored by the legislature. I respectfully, but strongly, dissent. 
Background
       James Harmon Jaubert, Jr., also known as “Big Jube” and “J.J.,” entered a plea of guilty to
one count of murder and four counts of attempted murder. He elected to have the jury assess
punishment. They did. Now he complains that his trial counsel was ineffective. The basis of the
complaint is that his trial counsel did not request the State to disclose its intent to use evidence of
extraneous bad acts during punishment. On the record before us and on the application of 
controlling laws and precedent, I would hold that Jaubert failed to prove his claim and affirm the
judgment.
The Statute
       Jaubert relies on a provision of the Code of Criminal Procedure which, on request by the
defendant, requires the State to disclose their intent to rely on extraneous offenses or bad acts for
the assessment of punishment. The Code provides:
Sec. 3. Evidence of prior criminal record in all criminal cases after a finding of
guilty.
 
(a) Regardless of the plea and whether the punishment be assessed by the judge or
the jury, evidence may be offered by the state and the defendant as to any matter the
court deems relevant to sentencing, including but not limited to the prior criminal record
of the defendant, his general reputation, his character, an opinion regarding his
character, the circumstances of the offense for which he is being tried, and,
notwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, any other
evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by
evidence to have been committed by the defendant or for which he could be held
criminally responsible, regardless of whether he has previously been charged with or
finally convicted of the crime or act....

***
 
(g) On timely request of the defendant, notice of intent to introduce evidence under
this article shall be given in the same manner required by Rule 404(b), Texas Rules of
Criminal Evidence. If the attorney representing the state intends to introduce an
extraneous crime or bad act that has not resulted in a final conviction in a court of
record or a probated or suspended sentence, notice of that intent is reasonable only if the
notice includes the date on which and the county in which the alleged crime or bad act
occurred and the name of the alleged victim of the crime or bad act. The requirement
under this subsection that the attorney representing the state give notice applies only if
the defendant makes a timely request to the attorney representing the state for the notice.
Tex. Code Crim. Proc. Ann. art. 37.07 § 3. (a) and (g)(Vernon Supp. 2000)(Referred to herein
as “Article 37.07").
Events at Trial
       Jaubert entered a guilty plea to one murder charge and four attempted murder charges. He
elected to have the jury determine punishment. In its case-in-chief, the State introduced evidence
of each of the crimes. Each was the result of gang related drive-by shootings. The first drive-by
shooting resulted in one victim being shot twice. In the second shooting, the victim was shot
once in the buttocks, and the bullet was lodged too close to his spine to be removed. The third
drive-by shooting occurred approximately six minutes after the second shooting. The third
shooting resulted in two victims being wounded and one victim being killed.
       In the first full day of trial, the State presented its case for punishment. It was very direct. 
The evidence was limited to the crimes for which the defendant had entered a guilty plea. The
witnesses consisted of the four surviving victims and one eye witness, the deceased victim’s
mother, three officers that were primarily involved in investigating each of the three shootings,
the photographer that photographed the scene of the third shooting and the recovered stolen
vehicle from which two of the shootings were carried out, a fire arms expert and the Chief
Medical Examiner that performed the autopsy on the deceased victim. There were a total of
twelve witnesses presented by the State in its case-in-chief. There was no mention of extraneous
crimes or other bad acts.
       The defense theory was clear. James Jaubert, Jr. was no longer the same person he had been
at the time of the crimes. He was wholly reformed, having rediscovered God. He was the son of
a minister that had lost his connection but had found it again. Given that Jaubert entered a plea
of guilty to all five charges, this was a very sound trial strategy to get his sentence as low as
possible or possibly to be released on community supervision. Of course there was no need to
establish his fall from grace. The State had already done that. To establish his history as a good,
well mannered child and youth, Jaubert called his high school assistant principal, a second cousin
that grew up with him in church, his retired pastor and a civil rights investigator for the federal
government that worked with his mother. These were all historical witnesses that knew him
before his gang involvement and referred to him as “J.J.”
       The defense then called a cousin that had received a recent phone call from Jaubert in which
he lead her in prayer, a lawyer that also had a son in the Tarrant County jail and had gotten to
know Jaubert’s parents from meeting them at visitation and an uncle that was also a minister of
the Gospel. The latter two witnesses both related the changes that Jaubert’s father reported to
them in Jaubert’s demeanor and attitude which had occurred while he was in jail. The defense
then called both of Jaubert’s parents and Jaubert himself. These witnesses testified about the
new Jaubert, who was changed and repentant for what he had done. They testified about how he
had changed his life and how he was trying to help them raise their children and help others learn
from his mistakes.
       The State called several witnesses to rebut the evidence that Jaubert had changed including
several who had very negative opinions about his reputation for being a law abiding citizen. 
There were also at least two rebuttal witnesses that directly impeached statements that Jaubert
made during his testimony.
       Based on the jury’s verdict, he was sentenced to terms in prison of 60/20/10/10/10 years on
the five charges, with no recommendation for community supervision and no fines. The
sentences run concurrently.
        His argument on appeal is that by his attorney having failed to obtain notice that the State
intended to use evidence of extraneous crimes and other bad acts, he was unprepared and his
witnesses were ambushed by very damaging allegations of extraneous crimes and other bad acts
in which he had engaged. The principle testimony about which complaint is made relates to the
rape of another inmate in the Tarrant County jail. To fully understand why the testimony was
admissible, and why it was not ineffective assistance of counsel to not object to most of the
references to the rape (some were objected to), requires a review of the full record, not just what
appellant cites in his brief.
Summary of the Testimony
       There was no reference made to the rape through the first 18 witnesses at trial. This
included the entirety of the State’s case-in-chief and the first six of Jaubert’s witnesses. The
nineteenth witness was Louis Pedleton. Pedleton is Jaubert’s uncle and is a minister. Like
several of the other witnesses, he was offered to show that Jaubert would respond to efforts to
rehabilitate him and that he was a good candidate for community supervision. At the conclusion
of Pedleton’s direct testimony, Pedleton testified that Jaubert’s father had related to Pedleton that
Jaubert had turned his life around while in jail and had “become closer to the Lord.”
       Cross-examination of Pedleton focused on his knowledge of Jaubert and the witness’s
knowledge of the conduct in which Jaubert had engaged. It was very extensive. In several pages
of questioning, the State established that Pedleton knew very little about what Jaubert was on
trial for or what conduct Jaubert had engaged in while in jail. Significantly, there was only one
question related to the prison rape in several pages of cross-examination. The testimony was
clearly not intended as proof of any of the incidents referred to but rather to test the basis of the
witness’s knowledge of Jaubert and his purported change in attitude.
       The next witness was Jaubert’s father, James Sr. James Sr. was also being offered as a
character witness to establish that Jaubert had changed his life, was from a good home, would be
a good candidate for rehabilitation and should receive a short sentence or community
supervision. The record does not indicate any breaks or interruptions after the rape was first
mentioned during the cross-examination of Pedleton during which the defense could have
educated themselves or prepared James Sr. regarding the rape incident. However the testimony
which was elicited during the direct examination of Jaubert’s father indicates not only counsel’s
familiarity with the event but the witness’s as well, and that Jaubert’s strategy to defend against it
was to explain that he was not involved in the rape.
       On cross-examination, the State tested James Sr.’s knowledge regarding his son’s
“involvement” in the rape. Again, it is obvious the State was testing the witness’s knowledge of
the character of Jaubert and his suitability for community supervision.
       Next came the testimony of Jaubert. Again, the defense strategy was to establish that all the
bad things that Jaubert had done in his life were in his past life as a gang member and that he was
coming clean with the jury with all his misdeeds. This included Jaubert confessing to another
drive-by shooting for which he was not on trial (making a total of four confirmed drive-by
shootings in which he was involved). He also testified about two specific “conflicts” in which he
had been involved while in jail. One involved a fight with other inmates and one involved a
confrontation with a guard. He denied involvement in the rape. He testified that he slept through
it, and the only way he was aware of it was because another inmate told him.
       On cross-examination, the State inquired about several incidents in jail about which he had
not testified. He continued to deny involvement in the rape.
       The presentation and cross-examination of Jaubert’s witnesses took roughly the same
amount of time as the presentation and cross-examination of the State’s witnesses during its case-in-chief: just over one full day of testimony. 
       In rebuttal to Jaubert’s defense strategy to show that he was a good candidate for
rehabilitation, deserving of a light sentence and a recommendation for community supervision,
the State called seven witnesses. These witnesses rebutted specific aspects of the picture that
Jaubert had attempted to paint during his defense. Eddie L. South, a lieutenant from the Tarrant
County jail, testified about the rape incident. During his direct testimony, Jaubert objected that
the question called for hearsay as to what the victim of the alleged raped had reported to the
investigating officer. Upon raising the hearsay objection, the State specifically explained it was
offering this testimony only for impeachment purposes, not for the truth of the matter asserted. 
The trial court sustained the hearsay objection and would not allow Lieutenant South to testify
what the victim had told him. Again, upon a close reading of the direct and cross-examination of
Lieutenant South, the record reveals that Jaubert, and in particular his counsel, continued with a
specific plan of defense against Jaubert’s involvement in the prison rape. Specifically, the
strategy was to show that due to the cell assignments Jaubert could not have participated in the
rape that Lieutenant South had investigated.
       Jaubert took the stand again to rebut the impeachment evidence. With regard to the rape, his
story changed slightly on direct examination. He testified that there had been more than one
rape. However, he continued with the strategy to show that he was not involved and could not
have participated in the rape because of the cell to which he was assigned.
       However, on cross-examination, Jaubert’s testimony of the extent and source of his
knowledge about the rape changed dramatically. He testified about multiple rapes, and he no
longer testified that he slept through them and was only aware of them based upon what someone
told him. His testimony reveals that at least one of the rapes occurred while he was in the day
room and the door to the cell in which the rape occurred was open. Thus, his testimony changed
from one rape which he slept through and knew nothing about, to multiple incidents, at least one
and possibly two of which he admits he at least observed.
Standard of Review for Claim of Ineffective Assistance of Counsel
       Now, with a firm basis of the events as they occurred at trial, we turn to the application of
the law regarding an allegation of ineffective assistance of counsel. In assessing the effectiveness
of counsel, we apply the test set forth by the Supreme Court in Strickland v. Washington. 
Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Ex
parte Jarrett, 891 S.W.2d 935, 938 (Tex. Crim. App. 1994). Strickland requires us to determine
whether:
       (1) counsel's performance was deficient; and if so,
       (2) whether there is a reasonable probability the results would have been different but for
counsel's deficient performance.
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.
       "Consideration of the 'totality of the representation,' rather than isolated acts or omissions of
trial counsel, determines whether this standard has been met." Ex parte Kunkle, 852 S.W.2d 499,
505 (Tex. Crim. App. 1993) (quoting Ex parte Raborn, 658 S.W.2d 602, 605 (Tex. Crim. App.
1983)); accord Ferguson v. State, 639 S.W.2d 307, 310 (Tex. Crim. App. [Panel Op.] 1982). We
strongly presume that counsel's conduct lies within the "wide range of reasonable representation." 
McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996). It is not an allegation that
should be made lightly. Estes v. State, 985 S.W.2d 684, 685 (Tex. App.—Fort Worth 1999, pet.
ref’d). An appellant bears a “tremendous burden” in proving ineffective assistance of counsel. 
Shilling v. State, 977 S.W.2d 789, 791 (Tex. App.—Fort Worth 1998, pet. ref’d). “The accused
must overcome this presumption by affirmatively showing that his representation fails the
two-part test set forth in Strickland.” Id.
       Generally, we examine the totality of the representation in gauging the effectiveness of
counsel. Raborn, 658 S.W.2d at 605. In some situations however, a single omission on
counsel's part can be considered ineffective assistance. Ex parte Felton, 815 S.W.2d 733, 735
(Tex. Crim. App. 1991); Pena-Mota v. State, 986 S.W.2d 341, 344 (Tex. App.—Waco 1999, no
pet.). Our scrutiny of counsel’s performance must be highly deferential, and every effort must be
made to eliminate the distorting effects of hindsight. See Strickland, 466 U.S. at 689, 104 S.Ct.
at 2065; Beheler v. State, 3 S.W.3d 182, 185 (Tex. App.—Fort Worth 1999, pet. ref’d). 
“Representation is not ineffective simply because, in hindsight, the attorney could have or even
should have done something differently.” Godwin v. State, 899 S.W.2d 387, 392 (Tex.
App.—Houston [14th Dist.] 1995, pet. ref’d). Allegations of ineffective assistance of counsel
must be firmly founded in the record. Beheler, 3 S.W.3d at 185-186.
The Majority’s Misapplication of the Rules
       Before there can be ineffective assistance of counsel, counsel’s performance must have been
deficient. This means that counsel either took some improper action that was damaging to the
client, or, as is more often the case, failed to take some action that would have benefitted the
client. Jaubert contends his counsel’s conduct falls into the latter category. In Jaubert’s brief and
in the majority opinion, there are references to various shortcomings of Jaubert’s counsel in
failing to request the State’s intent to use extraneous bad acts, the failure to obtain a pretrial
ruling on admissibility of the evidence and the failure to object to the evidence. However, there
is no ineffective assistance of counsel if an Article 37.07 request would not have required
production by the State of the evidence about which complaint is now made. Thus, we must
determine if a proper Article 37.07 request would have required production of the information. 
Further, we must determine if there are theories under which the State could have used the
evidence other than Article 37.07.
 

State’s Case-in-Chief



       In a very well reasoned and analytical opinion, the Fort Worth Court has specifically held
that if the evidence of extraneous bad acts is not introduced in the State’s case-in-chief, the State
does not have to have complied with an Article 37.07 § 3(g) request. Washington v. State, 946
S.W.2d 501 (Tex. App.—Fort Worth 1997, no pet.). In Washington, the Court analyzed the prior
case law, the language of the statute and the legislative history and explained its holding and
reasoning as follows:
This construction, i.e. that section 3(g)'s notice provision only applies to the State's
case in chief, does not produce an absurd result. The State must notify the defendant of
all evidence it intends to introduce against the defendant in its case in chief, and the
defendant is told of evidence that will be directly introduced against him. To hold
otherwise would require the State to predict all possible arguments that a defendant
might raise and then notify the defendant of the evidence that would rebut those
possible arguments. This would directly contravene cases that hold the State does not
have to disclose the identity of rebuttal witnesses. E.g., Elkins v. State, 543 S.W.2d 648,
649 (Tex. Crim. App. 1976); Hoagland v. State, 494 S.W.2d 186, 189 (Tex. Crim. App.
1973).
 
This interpretation also gives due deference to the phrases "notice of intent to
introduce evidence under this article ... " and "[i]f ... the state intends to introduce an
extraneous crime or bad act...." Tex. Code Crim. Proc. Ann. art. 37.07 § 3(g) (Vernon
Supp. 1997) (emphasis added). The State cannot intend to introduce true rebuttal
evidence before trial. Evidence that is offered in rebuttal cannot be foreseen because the
State does not know what theories the defendant will advance at punishment. See
Hoagland, 494 S.W.2d at 188-89; Doyle v. State 875 S.W.2d 21, 22 (Tex. App.—Tyler
1994, no pet.).

Id. at 506 (emphasis as in original).
       Because none of the evidence complained of by Jaubert was introduced in the State’s case-in-chief, if Jaubert had filed the appropriate request for notice of the State’s intent to use
evidence of extraneous bad acts, the State would not have had to provide the information
regarding the evidence about which Jaubert now complains. Quite simply, the State would have
had no duty to make the disclosure even if Jaubert’s attorney had made the Article 37.07 request. 
Thus there can be no ineffective assistance of counsel for having failed to make the request in the
first instance.
Impeachment Evidence
       In addressing the applicability of Article 37.07, several courts have drawn distinctions
between evidence offered for impeachment versus evidence of extraneous bad acts offered to
assist the jury in determining proper punishment. Calderon v. State, 950 S.W.2d 121, 132 (Tex.
App.—El Paso 1997, no pet.); Barnett v. State, 847 S.W.2d 678, 679-680 (Tex.
App.—Texarkana 1993, no pet.); Paley v. State, 811 S.W.2d 226, 229 (Tex. App.—Houston [1st
Dist.] 1991, pet. ref’d.). In a case similar to the procedural and factual development of this case,
the El Paso Court analyzed the issue as follows:
In order to demonstrate that Calderon was a good candidate for probation, her counsel
called Sara Mendoza, Calderon's mother, as a witness. Counsel asked Mendoza a single
question relating to her eligibility for probation--whether Calderon had ever been
convicted of a felony. To this question, Mendoza answered no. On cross-examination,
the State asked Mendoza whether she was aware that Calderon had been convicted for
marijuana possession in 1978. Mendoza answered in the negative. Mendoza also
testified that she and her daughter did not visit with one another. Calderon asserts that
her counsel should have objected to the question about the marijuana conviction and
should have addressed it in a motion in limine. Notwithstanding the fact that extraneous
offenses are admissible, see Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a) (Vernon
Supp. 1996), this question was appropriate impeachment of a defense witness. See Tex.
R. Crim. Evid. 607; see also McMillian v. State, 865 S.W.2d 459, 460 (Tex. Crim. App.
1993); Anderson v. State, 896 S.W.2d 578, 579 (Tex. App.—Fort Worth 1995, pet.
ref'd). Calderon's counsel was not ineffective for failing to object to this evidence.

Calderon v. State, 950 S.W.2d 121, 132 (Tex. App.—El Paso 1997, no pet.). In Paley, the First
Court of Appeals in Houston held that the trial court erred in refusing to allow proper
impeachment of a defense witness about extraneous bad acts and that cases applying Article
37.07 did not prohibit it. Paley, 811 S.W.2d at 229.
       Jaubert complains about questions asked on cross-examination of Pedleton, James Sr., and
himself. In applying this analysis to the testimony about which Jaubert complains, it is evident
that the testimony elicited by the State was impeachment evidence. The inquiry by the State was
to impeach the witness’s testimony regarding Jaubert’s suitability for rehabilitation, a light
sentence or a recommendation for community supervision. The questioning was proper
impeachment and not the introduction of evidence of extraneous bad acts during the punishment
phase pursuant to Article 37.07 § 3(a).
Opening the Door
       Other courts, including the Second Court of Appeals in Fort Worth, have analyzed the issue
on the well established basis that if a defendant opens-the-door to an otherwise prohibited area of
questioning, he cannot then be heard to object when the State decides to make further inquiry
into the area. Anderson v. State, 896 S.W.2d 578, 579 (Tex. App.—Fort Worth 1995, pet.
ref’d.); McKee v. State, 855 S.W.2d 89, 91-92 (Tex. App.—Houston [14th Dist.] 1993, no pet.). 
The Fourteenth Court of Appeals’ analysis related to another section of Article 37.07 but is
analogous to this case. The Court stated:
Article 37.07 § 4(d) provides that "This section does not permit the introduction of
evidence on the operation of parole and good conduct time laws." Appellant contends
that the State's questions and the elicited answers introduced evidence on the operation
of parole laws. We agree. However, otherwise inadmissible evidence can be introduced
during cross examination if the Appellant has opened the door to that issue. Ortiz v.
State, 834 S.W.2d 343, 346 (Tex. Crim. App. 1992).
 
When a party introduces matters into evidence, he invites the other side to reply. 
Kincaid v. State, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976). On direct examination
by his attorney, Appellant testified that he had twice before been convicted but he had
only spent a total of nine months in jail. We find that the State was properly permitted
to cross examine the Appellant about the sentences he received, and the amount of time
he spent in jail. Appellant clearly opened the door.
McKee, 855 S.W.2d at 91-92.
       The Fort Worth Court, on facts similar to Jaubert’s, has determined that once the appellant
opens the door, the State is not prohibited by Article 37.07 from introducing evidence of
extraneous bad acts. The facts that the Court was dealing with and their holding are as follows:
In his sole point of error, appellant contends that the trial court erred in admitting
evidence of a prior extraneous offense. In reviewing a trial court's decision regarding
the admissibility of evidence of an extraneous matter, an appellate court must measure
the trial court's ruling under an abuse of discretion standard. Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).
During the punishment phase of trial, appellant offered the testimony of a Reverend
R.L. Taylor, who had known appellant nearly all of his life. Based on his personal
knowledge and contact with appellant, Reverend Taylor opined that appellant would be
a good candidate for probation. Reverend Taylor was then confronted with "have you
heard" questions about appellant's prior brushes with the law. In response, Reverend
Taylor stated that he was not concerned about appellant's prior misconduct because he
believed appellant had turned his life around and thus would be a good candidate for
probation "in the future."
 
In rebuttal, Birdie Lundsford testified for the State that on April 6, 1991, when she
was thirteen-years-old, appellant exposed himself and masturbated in front of her and
her two-year-old nephew in a public park. Appellant argues the trial court erred in
admitting Lundsford's testimony on the grounds that it constitutes inadmissable
extraneous offense evidence under Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a).
[footnote omitted] See Grunsfeld v. State, 843 S.W.2d 521 (Tex. Crim. App. 1992). 
We disagree.
 
By offering Reverend Taylor's testimony that appellant was a "good candidate" for
probation, appellant "opened the door" to rebuttal evidence about the specific bad act of
indecent exposure. McMillian v. State, 865 S.W.2d 459, 460 (Tex. Crim. App. 1993);
Grunsfeld, 843 S.W.2d at 526 n. 12; Ortiz v. State, 834 S.W.2d 343, 344-46 (Tex. Crim.
App. 1992); Griffin v. State, 787 S.W.2d 63, 67 (Tex. Crim. App. 1990); Murphy v.
State, 777 S.W.2d 44, 67-68 (Tex. Crim. App. 1988). In other words, by tendering
evidence of his "suitability" for probation, appellant in effect consented to the admission
of specific acts of conduct to inform the jury's discretion in deciding what punishment to
assess. Griffin, 787 S.W.2d at 67. See also Kuczaj v. State, 848 S.W.2d 284, 291 (Tex.
App.—Fort Worth 1993, no pet.).

Anderson, 896 S.W.2d at 579-580.
       Jaubert’s witnesses, in particular James Sr. and Jaubert, testified on direct that he was a
changed person, that the change was real and that he was a good candidate for rehabilitation, a
lenient sentence or a recommendation for community supervision. They also specifically denied
Jaubert’s involvement in the rape. This testimony “opened-the-door” for the State to contradict
the testimony with “specific acts of conduct to inform the jury’s discretion in deciding what
punishment to assess.” Id. We should not use hindsight to second guess trial counsel’s strategy.
Testing Character Witnesses
       The Austin Court has analyzed the issue on similar facts as one of testing the basis of a
character witness’s knowledge on cross-examination. The Court’s analysis is as follows:
Appellant also urges that extraneous offense evidence was improperly adduced
during the punishment phase of trial. Defense witness Larry Jackson testified that he
had known appellant most of his life and that, in his opinion, appellant was a peaceful
and law-abiding person. During cross-examination, the State asked Jackson if he "ever
heard that [appellant] was involved in a stabbing at the Alcoa Inn" and if he "heard
about a complaint against [appellant] made by a--a woman here in Cameron for
aggravated sexual assault." Appellant objected to "these specific instances of conduct
unless the State can show that there's been some kind of conviction." Appellant now
argues that the State was required to prove appellant's guilt of the unadjudicated
offenses beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)
(West Supp.1995).
 
Appellant's contention on appeal does not comport with his trial objection and is
without merit in any event. The State was not attempting to prove appellant's
commission of unadjudicated offenses pursuant to article 37.07, but to test the weight of
Jackson's character testimony. A witness who testifies to the defendant's good character
may be cross-examined regarding relevant specific misconduct by the defendant. 
Reynolds v. State, 848 S.W.2d 785, 788 (Tex. App.—Houston [14th Dist.] 1993, pet.
ref'd); Bratcher v. State, 771 S.W.2d 175, 186-87 (Tex. App.—San Antonio 1989, no
pet.); Lancaster v. State, 754 S.W.2d 493, 495 (Tex. App.—Dallas 1988, pet. ref'd);
Tex. R. Crim. Evid. 405(a). [footnote omitted]. Appellant did not challenge the factual
basis of the State's questions at trial and there is nothing in the record to suggest that the
questions were asked in bad faith. Appellant's trial objection was correctly overruled. 

Drone v. State, 906 S.W.2d 608, 616 (Tex. App.—Austin 1995, pet. ref’d).
Summary
       There are several different analysis that could be applicable to the testimony on cross-examination about which Jaubert complains. Not being part of the State’s case-in-chief, the
Article 37.07 disclosure requirement would have never been triggered, even if the request had
been made by Jaubert’s counsel. Likewise, whether the testimony is analyzed as impeachment
testimony, testing the witness’s knowledge or whether the defendant opened the door to the
admission of otherwise inadmissible testimony, the result is all the same. The evidence would
not have been responsive to an Article 37.07 request. Trial counsel was not ineffective in failing
to object. The testimony was either not objectionable or any objection could have been easily
overcome by the State. See Reynaga v. State, 776 S.W.2d 777, 779 (Tex. App.—Corpus Christi
1989, no pet.). On this record, it cannot be said that trial counsel was ineffective by failing to
make an Article 37.07 request, failing to object to the testimony or in failing to secure a pre-trial
ruling on its admissibility.
Ignoring Higher Court Precedent
       From the record discussed above, there is no per-se evidence of ineffective assistance. The
majority concludes that the Jaubert’s counsel was ineffective because he did not file a request
pursuant to Article 37.07.


 However, to conclude that this was ineffective assistance of counsel,
a mountain of assumptions must be overcome. The majority overcomes them all by simply
changing the presumption the Court of Criminal Appeals has directed that we are bound to
apply–to “strongly presume” that counsel was effective. McFarland v. State, 928 S.W.2d 482,
500 (Tex. Crim. App.1996). Reversing this presumption allows the majority to conclude that
“Jaubert’s trial counsel’s failure to request notice under Article 37.07 § 3(g) was unreasonable
and cannot be justified by any trial strategy within our imagination.” I guess my “imagination” is
a bit more active than my colleagues on the bench.
       Rather than presume effective assistance of counsel, they have presumed ineffective
assistance and searched the record for an explanation to justify why counsel would not have
made the request. Even in this search, they ignore the statements in the record that indicate a
perfectly reasonable explanation for not filing a request for the Article 37.07 disclosure. The
Tarrant County District Attorney has an open file policy. Jaubert’s attorney could have examined
the DA’s file and determined that the jail offense reports were present. In this very efficient
manner, counsel could have learned what information the DA’s office had and could prepare to
respond to it. This could be done without the need for a formal request and a formal response. 
Jaubert loses no statutory rights and does not receive any less effective representation. In fact,
this may work to Jaubert’s benefit by not forcing the State to focus on the other-bad-act evidence
by having to prepare a written response to the defendant’s request.
       Further, there is no prohibition from obtaining this information by way of an oral request.
The majority ignores this possible explanation and thus presumes there was no oral request. Of
course, there is no documentation to prove that an oral request was made. But the statute does
not require a written request before the State can provide the responsive information. By
allowing for the possibility of an oral request and informal response, the lawyers are left to work
out the discovery in the most efficient manner with the least amount of paper wasted. It seems
that we should do everything we can to facilitate this type of cooperation rather than destroy it. 
       As indicated, there is no evidence in the record of an oral request and nothing in the record
that affirmatively shows that the State provided the information in response to an oral request or
simply volunteered the information, knowing that if requested that they would have to produce it. 
This brings me back to the presumptions. The majority has presumed that there was no oral
request and no voluntary cooperation, again presuming ineffectiveness. Whereas, I presume this
could be a perfectly reasonable explanation for the absence of a written request. This becomes
an evidentiary issue that could be resolved at a fact hearing.
       I believe that the Court of Criminal Appeals has clearly articulated the effect of the rules
applicable to evaluating claims of ineffective assistance of counsel. The clear result of the
applicable presumptions is that if any set of facts that is not contrary to the existing record could
exist that would allow the conclusion to be reached that counsel was effective, the judgment must
be affirmed.
       As it has been repeatedly discussed in prior cases, because of the inability to resolve
potential factual disputes or issues, direct appeal of ineffective assistance of counsel claims is
particularly difficult. Without a record to develop the factual underpinnings of a claim, a cold
record is seldom adequate to prove ineffectiveness of counsel. See Gonzalez v. State, 994
S.W.2d 369 (Tex. App.—Waco 1999, no pet.); Foster v. State, 8 S.W.3d 445 (Tex. App.—Waco
1999, no pet.). The defendant is not without relief. The defendants relief is by a post trial writ of
habeas corpus to show that the state of facts which could exist does not in fact exist. 
       Of course there is a much more pragmatic explanation for not making the Article 37.07
request. It is a problem trial lawyers face all the time. “Do I make the request and cause the
opposition to focus on the issue, and possibly cause them to discover previously unknown bad
acts, or do I trust my client to tell me what is out there in the way of other bad acts and simply
prepare to meet it if the State is aware of it and decides to use it?” Even civil practitioners are
faced with this dilemma when requesting discovery of whether their opponent intends to use any
final convictions to impeach any of their witnesses. Tex. R. Evid. 609 (f). This is a variant of
the doctrine-of-negative-surveillance–“Do I ask for something that may work to my benefit but
also has the very real risk of causing me to come under greater scrutiny?”
       Another possible explanation, given the excellent manner in which defense counsel
conducted Jaubert’s case, is that having nothing to counter this evidence with, the defense “put
their best foot forward” and hoped for the best. Jaubert may have been fully aware of the State’s
intended use of the information but had no other evidence to counter it with. Even on appeal,
Jaubert has not claimed that he would have done a single thing differently had he known the
State possessed and intended to use this information. I would say his trial strategy worked pretty
well for Jaubert. His sentence for killing one person and attempting to kill four others was a
maximum time in prison of only 60 years.
Rewriting The Statute
       The part of the statute relevant to this case requires that only if the State intends to use
evidence of a prior bad act in the punishment phase of the trial to enhance sentencing and only if
the defendant makes a timely request, must the State disclose the alleged date and location of the
incident and the name of the victim. Under the guise of ineffective-assistance-of-counsel, the
majority has rewritten the statute to require the State to disclose evidence of extraneous bad acts,
without a request, if under any scenario which may develop at trial the State could seek to
introduce or refer to a prior bad act or extraneous offense for any purpose. 
       If the State fails to make this disclosure the State must forego all use of the evidence or the
defendant is guaranteed a new trial. The majority will entertain no theory or explanation that the
request and disclosure were unnecessary, that there is any theory under which the failure to
request the notice could have been sound trial strategy or that the evidence did not contribute to
the punishment. They have given the criminal defendant much greater rights than did the
legislature.
       This judicial rewrite of the Code of Criminal Procedure causes me the same concerns the
Court of Criminal Appeals expressed when it held that a motion to obtain Article 37.07
information did not trigger the State’s duty to provide the information until the motion was
actually ruled on by the court. Mitchell v. State, 982 S.W.2d 425, 427 (Tex. Crim. App. 1998). 
In Mitchell the Court stated:
To hold otherwise would encourage gamesmanship. The opposite rule could
encourage defendants to bury requests in voluminous motions, hoping the State would
either overlook it or believe ... the request to be contingent on a court order. An ad hoc
approach would encourage gamesmanship on the part of both parties. We do not
ascribe such motives to counsel in the present case, but we recognize the potential for
abuse.
Id. My fear is that the very decision of whether or not to make an Article 37.07 request, versus
the potential to obtain a new trial (at least on punishment) will become part of trial strategy.
Conclusion
       I would not rewrite the statute. I would follow binding Court of Criminal Appeals
precedent. I would follow the applicable statute and evidentiary rules including the interpretation
thereof by our sister courts, in particular the Fort Worth Court of Appeals from which this case
was transferred to us. I would affirm the judgment and hold that on the record before us Jaubert
has failed to meet his burden of showing that trial counsel was ineffective.


                                                                                      TOM GRAY
                                                                                      Justice

Dissenting opinion delivered and filed August 31, 2000
Publish